In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No.  11-2205

PEGGY S. LeGRANDE,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No.  08 C 2047 — Joan B. Gottschall, *Judge*.

## BRIEF OF THE UNITED STATES

TONY WEST
Assistant Attorney General

PATRICK J. FITZGERALD
United States Attorney

TIMOTHY GARREN
Acting Deputy Assistant Attorney General

JILL DAHLMANN ROSA
ALAN MATTIONI
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, DC, 20044
(847) 732-1141

# TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Acronym List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.    Nature of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.   Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    LeGrande's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Responsibility of the Southwest Pilots and Dispatcher . . . . . . . . . . . 3

    C.    The Altitude Decision of the Southwest Pilots . . . . . . . . . . . . . . . . . 4

    D.    The Responsibility of FAA Air Traffic Control . . . . . . . . . . . . . . . . . 5

    E.    Pilot Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    F.    Rapidly Changing Weather Conditions . . . . . . . . . . . . . . . . . . . . . 7

    G.    Meteorological Impact Statement . . . . . . . . . . . . . . . . . . . . . . . . . 8

    H.    The Responsibility of FAA Traffic Management Unit . . . . . . . . . . . . . . 11

    I.    No Known Severe Turbulence . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    J.    Center Weather Service Unit Briefing . . . . . . . . . . . . . . . . . . . . . . 12

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.    The District Court Properly Granted the United States'
        Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    The Air Traffic Controllers Breached
            No Duty to Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.    The FAA Had No Duty To Broadcast the MIS on the
      Air Traffic Control Frequency . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

D.    LeGrande Could Not Meet Her Burden on Causation. . . . . . . . .  19

E.    LeGrande Has No Claim Against the NWS. . . . . . . . . . . . . . . . .  21

F.    The Record Contains No Evidence the Meteorologist
      Breached a Duty or Caused LeGrande's Injuries. . . . . . . . . . . .  23

II.  The Discretionary Function Exception Bars LeGrande's Claims
     Because They Challenge the FAA's and the NWS's Design of
     the Aviation Weather System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

B.    The Discretionary Function Exception . . . . . . . . . . . . . . . . . . . .  27

C.    The Challenged Actions Were Discretionary. . . . . . . . . . . . . . .  28

D.    The Challenged Actions Were Policy-Based. . . . . . . . . . . . . . . .  31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Certificate of Compliance with Fed. R. App. P. 32(a)(7)

Proof of Service

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Berkovitz v. United States,*
    486 U.S. 531 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Brown v. United States,*
    790 F.2d 199 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Collins v. United States,*
    564 F.3d 833 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

*Calderon v. United States,*
    123 F.3d 947 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Davis v. United States,*
    824 F.2d 549 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Deloria v. Veterans Admin.,*
    927 F.2d 1009 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hendricks-Robinson v. Excel Corp.,*
    154 F.3d 685 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Massey v. United States,*
    312 F.2d 272 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McNeil v. United States,*
    508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Menifee v. Ohio Welding Prod., Inc.,*
    472 N.E.2d 707 (Ohio 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mussivand v. David,*
    544 N.E.2d 265 (Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Palay v. United States,*
    349 F.3d 418, 425-26 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Richards v. United States,*
    369 U.S. 1 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ruiz v. Cont'l Cas. Co.,*
    400 F.3d 986 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schirmer v. Mt. Auburn Obstetrics & Gyn. Assoc., Inc.,*
    844 N.E.2d 1160 (Ohio 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Second Nat'l Bank of Warren v. Demshar,*
    707 N.E.2d 30 (Ohio App. Ct. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Somlo v. United States*,
  274 F. Supp. 827 (N.D. Ill. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Spurgin-Dienst v. United States*,
  359 F.3d 451 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*United States Aviation Underwriters, Inc. v. United States*,
  562 F.3d 1297 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27, 29-31

*United States v. Gaubert*,
  499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
  467 U.S. 797 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wallace* v. *Ohio Dept. Of Commerce*,
  773 N.E.2d 1018 (Ohio 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Whiting v. Ohio Dept. of Mental Health*,
  750 N.E.2d 644 (Ohio App. Ct. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Williams v. REP Corp.*,
  302 F.3d 660, 666 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes**

28 U.S.C. § 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2401(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

28 U.S.C. § 2671-80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Regulations**

14 C.F.R. § 15.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14 C.F.R. § 91.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

14 C.F.R. § 121.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14 C.F.R. § 121.395 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14 C.F.R. § 121.533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 20

14 C.F.R. § 121.593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

14 C.F.R. § 121.599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

14 C.F.R. § 533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 28

14 C.F.R. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## ACRONYM LIST

Definitions for many of these terms can by found in the Federal Aviation Administration Pilot/Controller Glossary.

http://www.faa.gov/air_traffic/publications/atpubs/pcg/

| | |
|---|---|
| ACARS: | Southwest Airlines' Aircraft Communications Addressing and Reporting System |
| AIM: | Aeronautical Information Manual |
| AIRMET: | Airmen's Meteorological Information |
| ARTCC: | Air Route Traffic Control Center |
| ATC: | Air Traffic Control |
| CWA: | Center Weather Advisory |
| CWSU: | Center Weather Service Unit |
| FAA: | Federal Aviation Administration |
| FL 200: | Flight Level 200 (20,000 feet) |
| FL 300: | Flight Level 300 (30,000 feet) |
| FSS: | Flight Service Station |
| GI Strip: | General Information Strip |
| HIWAS: | Hazardous Inflight Weather Advisory Service |
| MIS: | Meteorological Impact Statement |
| NWS: | National Weather Service |
| NWSI: | National Weather Service Instruction |
| PIREP: | Pilot Report |
| SIGMET: | Significant Meteorological Information |
| SWA: | Southwest Airlines |
| TMU: | Traffic Management Unit |
| TP: | Turbulence Plot prepared by the private meteorology department at Northwest Airlines |
| UTC: | Coordinated Universal Time (a/k/a Zulu time or Greenwich time) |

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

(1) Whether the district court properly granted the United States' motion for summary judgment because there are no disputed material issues of fact, and the Federal Aviation Administration air traffic controllers, as a matter of law, breached no duty to warn Southwest Airlines pilots about severe turbulence in their flight route because there were no reports of severe turbulence in that location before the Southwest Airlines airliner encountered it.

(2) Whether the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), protects the United States from liability for the way the Federal Aviation Administration and the National Weather Service designed the aviation weather system, including the decision of which weather forecasts are intended for use by pilots.

## STATEMENT OF THE CASE

### I. Nature of The Case

This litigation arises out of a turbulence incident over Ohio on February 10, 2006, when Southwest Airlines Flight 2745 flew into severe turbulence at an altitude of 20,000 feet. Peggy LeGrande is a flight attendant who claimed that she was injured in the turbulence.

The airliner was in the airspace of the Cleveland Air Route Traffic Control Center at the time of the incident. LeGrande alleged that the Cleveland Center air traffic controllers, employees of the U.S. Department of Transportation, Federal Aviation Administration ("FAA"), negligently failed to alert the pilots to the presence of the turbulence ahead. Doc. # 45. LeGrande sought $25 million in damages from the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80.

LeGrande's Complaints contained no allegations against the National Weather Service, an agency of the U.S. Department of Commerce, which employed the meteorologist at the Cleveland Center Weather Service Unit. Doc. ## 1, 45.

## II. Proceedings Below

LeGrande filed an administrative claim with the FAA in September 2007. Doc. # 60-1, Admin. Claim. She did not file an administrative claim with the Department of Commerce.

She alleged in her claim that the airliner hit turbulence at 0315 Coordinated Universal Time ("UTC")[1] and that the FAA failed to advise the pilots of two previous pilot reports of severe turbulence, made at 0258 UTC and 0305 UTC. Doc. # 60-1. The agency denied the claim in March 2008 (Doc. # 60-1), and LeGrande filed this suit the following month, alleging that the FAA failed to advise the airline of the pilot reports. Doc. # 1. Discovery included nine fact witness depositions and five expert witness depositions. Liability discovery closed in January 2010.

After it was determined that the 0258 UTC report actually came from the pilots of *her* flight, LeGrande filed an amended complaint, removing the reference to the two specific pilot reports. Doc. # 45.

LeGrande and the United States both moved for summary judgment. Doc. ## 59, 62. The district court granted the United States' motion and denied LeGrande's motion and entered judgment in favor of the United States. Doc. ## 78, 79.

## STATEMENT OF FACTS

### A. LeGrande's Claims

LeGrande's amended complaint alleged that employees of the FAA were aware of unspecified "pilot reports, weather reports and forecasts and other weather related products generated and issued by the Cleveland Center Weather Service

---

[1]  Coordinated Universal Time (a/k/a Zulu Time) is used in aviation. Local time in Ohio was six hours behind UTC, so 0315 UTC was 9:15 p.m.

Unit meteorologist respecting severe clear air turbulence reported and/or forecasted to exist in and/or within close proximity to the flight path and chosen altitude of SWA 2745, including its flight path through the airspace boundaries of the Cleveland Air Traffic Control Center's jurisdiction." Doc. # 45, ¶ 6. LeGrande alleged that the FAA failed to provide the pilots with the above-mentioned, unspecified weather products issued by the Cleveland meteorologist. *Id*. ¶ 8.

## B. The Responsibility of the Southwest Pilots and Dispatcher

Before departure, the Southwest Airlines flight dispatcher instructed the pilots to fly at 30,000 feet to avoid forecasted moderate turbulence at lower altitude. Doc. # 60-7, Miga Dep. at 45, 82; Doc. # 60-4, Fitzgerald Dep. at 65-66. The pilots decided to fly at 20,000 feet instead, without consulting their dispatcher. Doc. # 60-7, Miga Dep. at 76, 97-98; Doc. # 60-4, Fitzgerald Dep. at 15, 65-66; Doc. # 60-3, Moberg Dep. at 51-54, 78, 139, 157-60.

A passenger airline, such as Southwest, is held to the highest safety standards in civil aviation. Southwest is required to comply with part 121 of the Federal Aviation Regulations. 14 C.F.R. §§ 121.1 to 121.1117. Under part 121, the airline is responsible for operational control of the airplane and must utilize qualified aircraft dispatchers in planning and monitoring each flight. 14 C.F.R. §§ 121.395, 121.533. The pilot in command of the airplane is responsible for the safety of the passengers and the crew, and, in flight, has full control and authority for the operation of the airplane. *Id*.

The pilot and the airline's dispatcher are, however, jointly responsible for the pre-flight planning and dispatch release of the flight. *Id*. The dispatcher must "specifically authorize" a flight before the pilot can take off. 14 C.F.R. § 121.593. The dispatcher is required to be familiar with the weather that may impact the flight: "No aircraft dispatcher may release a flight unless he is thoroughly familiar with reported and forecast weather conditions on the route to be flown." 14 C.F.R.

§ 121.599. Before a flight begins, the dispatcher is required to provide the pilot in command with all available reports and forecasts of weather phenomena "that may affect the safety of flight," including "clear air turbulence." 14 C.F.R. § 601. The dispatcher is also responsible for monitoring the progress of each flight, 14 C.F.R. § 533, and providing the pilot in command with any additional information of meteorological conditions that may affect the safety of the flight. 14 C.F.R. § 601. The dispatcher does this by watching a Southwest Airlines computer system that permits him to observe each flight in near real time (Doc. # 60-7, Miga Dep. at 43-44) and communicating with the pilots by radio or Southwest's on-board instant message computer system (called "ACARS"). *Id*. at 33-40.

The dispatcher for Flight 2745 was Southwest Airlines employee Walter Miga. Miga sent the pilots a weather package before the flight (Doc. # 60-9, weather package), and the pilots were required to be familiar with it. Doc. # 60-7, Miga Dep. at 59-61, 96. The weather packet was prepared by Southwest's computer system using both NWS and private aviation weather information. Doc. # 60-7, Miga Dep. at 20-31. If there had been any other reports or forecasts pertinent to this flight, Miga testified that he was required to send them to the pilots, and he would have sent them to the pilots. *Id*. at 123. Miga testified that he fully complied with his obligation to provide all pertinent weather information to the pilots. *Id*. at 49.

### C. The Altitude Decision of the Southwest Pilots

The flight's captain, Thomas Moberg, testified that he did not rely on the pilot reports in the weather package in deciding to fly at 20,000 feet. Doc. # 60-3, Moberg Dep. at 163-64. This flight crew had been flying around the Midwest all day, and Flight 2745 was their last flight of the day. *Id*. at 26-27. Their immediately prior flight was from Chicago to Cleveland, so they were in the same airspace, but flying the opposite direction. Captain Moberg testified that they experienced light to moderate turbulence on the previous flight: "It was choppy." *Id*. at 77. Captain

4

Moberg decided to return to Chicago at an altitude of 20,000 feet based on the turbulence they experienced in the previous flight. *Id.* at 77, 139.

Miga, the dispatcher, testified that if the pilots had called him before the flight to tell him that they were planning to fly at 20,000 feet, he would have "strongly advised against it." Doc. # 60-7, Miga Dep. at 76. Private aviation meteorologists had forecasted moderate turbulence for the airplane's flight path at altitudes of 20,000 to 26,000 feet. Doc. # 60-4, Fitzgerald Dep. at 112; Doc. # 60-7, Miga Dep. at 28-29. The dispatcher used this information in making his decision to authorize the flight at 30,000 feet. Doc. # 60-7, Miga Dep. at 52-54. The pilots had this private forecast in the weather package they received before departure, but did not give it much, if any, weight, in part because it was two hours old. Doc. # 60-7, Miga Dep. at 64-67; Doc. # 60-4, Fitzgerald Dep. at 40-41, 111; Doc. # 60-3, Moberg Dep. at 78, 122-25, 132.

After the incident, airline dispatcher Miga filed an "Irregularity Report" with the airline, explaining that he had authorized the flight for 30,000 feet to keep the airplane out of the forecasted moderate turbulence at lower altitudes. Doc. # 60-8, Miga Irregularity Report; Doc. # 60-7, Miga Dep. at 72, 82. After reviewing the incident, Southwest Airlines concluded that "[t]he pilots should have followed dispatch instructions and the information contained in the weather packet to avoid this incident." Doc. # 60-3, Moberg Dep. at 207-08.

### D. The Responsibility of FAA Air Traffic Control

The Southwest crew was receiving air traffic control services from the FAA Cleveland Air Route Traffic Control Center. Controllers at Cleveland Center provide services to airplanes flying at certain high altitudes over a six-state area. Cleveland Center is the fifth busiest air route traffic control center in the United States, handling close to three million airplanes a year. Cleveland Center's airspace is divided into 56 sectors. Doc. # 60-11, Behary Dep. at 21.

5

The primary purposes of the air traffic control system are to: (1) prevent a collision between aircraft operating in the system, (2) organize and expedite the flow of traffic, and (3) provide support for national security and homeland defense. Doc. # 60-10, Behary Decl. ¶ 2. Controllers may also provide additional, lower-priority services, such as broadcasting certain specific weather information, depending on the controllers' workload and other factors. *Id*. Controllers communicate with pilots only by radio. Doc. # 70, fact 38.

Air traffic controllers are not meteorologists; they are not trained to forecast or predict weather events. Doc. # 60-10, Behary Decl. ¶ 16. At Cleveland Center, certain significant weather information is distributed to controllers through "General Information strips," which are small pieces of paper that print out automatically at the controllers' workstations. Doc. # 60-10, Behary Decl. ¶ 11. When a controller receives a strip, the controller broadcasts it verbatim one time over the radio on the air traffic control frequency so all pilots on that frequency can hear it. *Id*. If the strip includes certain significant weather advisories, such as a "Significant Meteorological Information" advisory ("SIGMET"), the controller will read the advisory out loud and inform pilots that more detailed weather information can be obtained from a Flight Service Station or heard on a radio frequency dedicated solely to hazardous weather dissemination (called Hazardous Inflight Weather Advisory Service, "HIWAS"). *Id*. After the controller broadcasts the weather information, he places the strip in an "out box," indicating that it has been read on the frequency. A controller does not make up his own weather reports or forecasts – he simply reads the ones that are printed on the strip. *Id*.

### E.  Pilot Reports

On appeal, LeGrande appears to have abandoned the issue of the pilot reports that was central to the decision below. She previously complained that other pilots had reported severe turbulence to the FAA, but FAA employees at Cleveland Center

6

failed to provide these reports to the pilots of her flight. Doc. # 45, Am. Compl. ¶¶ 6-8. LeGrande identified three reports from pilots ("PIREPs") of severe turbulence before the incident, ranging from 1½ to 3½ hours before Flight 2745's departure. The PIREPs are named in the record by the time they were made:

* 2318 UTC over Windsor, Canada: included in the pilots' weather package before departure. Doc. # 60-9, Weather Package at 7; Doc. # 60-5, Burgess Dep. at 112-15.

* 2345 UTC over Lafayette, Indiana: three hours before Flight 2745 departed Cleveland; reported outside Cleveland Center's airspace. Doc. # 63-26 at 6.

* 0110 UTC over Portland, Indiana: 1½ hours before Flight 2745 departed Cleveland; reported outside Cleveland Center's airspace. Doc. # 63-26 at 3.

The pilot reports from 2345 and 0110 were not considered pertinent weather information for Flight 2745, so they were not included in the Southwest Airlines weather package. Doc. # 60-7, Miga Dep. at 31-36, 49, 96, 123. Dispatcher Miga testified: "Q: There were no PIREPs pertinent to the safety of the flight prior to the incident that they [the pilots] didn't already have, correct? A: Yes." *Id.* at 123.

### F.  Rapidly Changing Weather Conditions

According to Andrew Behary, Air Traffic Control Supervisor at Cleveland Center, turbulence occurs and changes extremely rapidly. Doc. # 60-11, Behary Dep. at 32-34. He testified that the "only way that we really know if it's occurring at a specific point in space and time is if somebody goes through it." *Id.* at 34; *see also id.* at 40. There is no weather radar that can display turbulence. Doc. # 60-10, Behary Decl. ¶ 16.

The most current weather information before the turbulence event was an "Airmen's Meteorological Information" ("AIRMET") issued thirteen minutes earlier at 0245 UTC, advising pilots of "occasional moderate turbulence" over the incident area. Doc. # 60-13, Janus Decl. ¶ 19. AIRMETs are issued by the NWS Aviation

Weather Center in Kansas City, Missouri, and are meant for use by pilots. *Id.* ¶¶ 8, 19. This AIRMET covered a large Midwestern area, including northern Ohio. *Id.*

The crew of Flight 2745 encountered and reported turbulence at 0258 UTC,[2] This is the event that caused LeGrande's alleged injuries. Twenty minutes later, the meteorologists in Kansas City issued a SIGMET for severe turbulence in that area. These multiple weather reports indicated to meteorologist Thomas Janus that the weather situation that night "was dynamic and rapidly changing." Doc. # 60-13, Janus Decl. ¶ 19.

### G. Meteorological Impact Statement

Aviation meteorologist Thomas Janus, an employee of the National Weather Service, was on duty at the Cleveland Center Weather Service Unit on the day of the incident. The NWS meteorologist at a Center Weather Service Unit generally provides meteorological consultation, forecasts, and advice to the FAA regarding the impact of weather on the FAA's missions, equipment outages and repairs, and FAA staffing. Doc. # 60-14, NWSI 10-803 at 3. The meteorologist also provides certain hazardous weather advisories for airborne aircraft. *Id.*

Janus creates different weather products for different audiences, with the scope of the product tied to its purpose. Doc. # 60-14, NWSI 10-803 at 7-14. For example, a "Center Weather Advisory" ("CWA") is an advisory made for pilots (Doc. # 60-13, Janus Decl. ¶ 7; Doc. # 60-14 at 11), whereas a "Meteorological Impact Statement" ("MIS") is a forecast made for air traffic managers. (Doc. # 60-13, Janus Decl. ¶ 5; Doc. # 60-14 at 10.)

An MIS is an unscheduled planning forecast generated by an aviation meteorologist for air traffic management and flow-control purposes. Doc. # 60-13, Janus Decl. ¶ 6. An MIS describes conditions that may begin within two to twelve

---

[2]  When the pilots made their report of the incident immediately after flying into the turbulence, they reported it as "moderate to severe." Doc. # 63-26, PIREPs; Doc. # 60-3, Moberg Dep. at 94.

hours and may impact the flow of air traffic in a specific air route traffic control center's area. Doc. # 60-14, NWSI 10-803 at 10. The FAA uses these forecasts to predict traffic volume and flow so that the FAA can properly staff its air traffic control positions. Doc. # 60-10, Behary Decl. ¶¶ 4-5. An MIS "enables [air traffic control] facility personnel to include the impact of specific weather conditions in their flow control decision making." Doc. # 60-14, NWSI 19-803 at 10. An MIS is a broad, big-picture weather forecast. Doc. # 60-13, Janus Decl. ¶ 5; Doc. # 60-14 at 10. When Janus analyzes data in preparation for creating an MIS, he considers long-term meteorological issues that may impact flow-control planning over a large area for a long time period. *Id.* ¶ 10. According to National Weather Service Instruction 10-803, an MIS is issued when, in "the forecaster's judgment," certain weather conditions "will adversely impact the flow of air traffic within the [air route traffic control center] area of responsibility." Doc. # 60-14 at 11.

The text of an MIS specifically states that it is "FOR ATC PLANNING PURPOSES ONLY." Doc. # 60-12. An MIS is not prepared or disseminated for use by pilots or controllers because it is, by definition, "a forecast and briefing product for personnel at [air traffic control and system command facilities] responsible for making flow control-type decisions." Doc. # 60-14, NWSI 10-803 at 10; *see also* Doc. # 60-13, Janus Decl. ¶¶ 5-6. Controllers do not receive a General Information strip when an MIS is issued, nor are they permitted to make a HIWAS alert to pilots. Doc. # 60-5, Burgess Dep. at 145, 203; Doc. # 60-10, Behary Decl. ¶ 21.

Captain Moberg stated in his affidavit that he was not familiar with the MIS weather product at all, and did not know of any authorization for him to use an MIS for operational purposes. Doc. # 60-15, Moberg Aff. ¶¶ 4-5. The airline's operations documentation lists the weather products that the airline is authorized to use for control of flight operations, and that list does not include an MIS. Doc. # 60-16, SWA Operations Specification § A010.

A Center Weather Advisory, in contrast, is an aviation weather warning "primarily used by air crews to anticipate and avoid adverse weather conditions in the en route and terminal environments." Doc. # 60-14, NWSI 10-803 at 11. A CWA is specifically tailored to pilots and has a narrow focus, generally valid for up to two hours only. *Id.*; Doc. # 60-13, Janus Decl. ¶ 10. A CWA identifies specific points and a short time period that would be useful to airborne aircraft or aircraft about to take off. *Id.* A CWA is issued when, "in the judgment of the CWSU meteorologist," certain conditions are met. Doc. # 60-14, NWSI 10-803 at 12. When a Center Weather Advisory is issued, controllers receive a General Information strip and make a one-time broadcast to advise pilots that more information can be obtained through HIWAS or a Flight Service Station. Doc. # 60-10, Behary Decl. ¶ 11.

Weather products issued by Center Weather Service Units, including MISs, are available in real time through the National Weather Service's weather dissemination system, including being posted on the Internet.[3] "The MIS is available on the normal NWS dissemination circuits including the INTERNET and FAA circuits." Doc. # 60-19, NWS Product Description for the MIS, Jan. 30, 2003, at 2. The dissemination of CWAs and MISs is automated, taking place through a telecommunications gateway and computer processing systems. Doc. # 60-14, NWSI 10-803 at 8-9. It is undisputed that the weather products at issue here were produced and disseminated according to the normal course of business of the FAA and the NWS (Doc. # 70, fact 67; Doc. # 60-13, Janus Decl. ¶¶ 12-13, 15), and thus were available to Southwest Airlines.[4]

---

[3]  Available at http://aviationweather.gov/products/cwsu.

[4]  Southwest Airlines' dispatcher testified that he had access to all National Weather Service products on the Internet, and he worked with three computers to monitor flights and check weather information on the Internet. Doc. # 60-7, Miga Dep. at 13, 23-24, 51, 114-15.

Janus stated in his declaration that forecasting turbulence is extremely difficult, and requires the subjective analysis of multiple sources of data. Doc. # 60-13, Janus Decl. ¶ 16. There is no graphic depiction of turbulence on a weather radar, such as there is for precipitation. *Id*. Janus relies on reports from pilots to determine if turbulence is actually occurring in the air. *Id*.

Janus issued three MISs on the day of the incident. The last two are known as MIS 02 and MIS 03. Doc. # 60-12. He generated MIS 02 at 1942 UTC, seven hours before Flight 2745 departed Cleveland. He generated MIS 03 at 0206 UTC, about 40 minutes before the flight's departure. Doc. # 60-12.

## H. Responsibility of FAA Traffic Management Unit

The mission of the FAA's Traffic Management System is "to balance air traffic demand with system capacity to ensure the maximum efficient utilization of the National Airspace System" with the goal of fostering "a safe, orderly, and expeditious flow of traffic while minimizing delays." Doc. # 60-18, FAA Order 7210.3, ¶ 17-1-1. Within the Traffic Management System are the Traffic Management Units, which are based at the twenty-two Air Route Traffic Control Centers around the country, among other locations. The mission of the Traffic Management Unit is to "monitor and balance traffic flows." *Id*. ¶ 17-1-3.

The Traffic Management Unit obtains and analyzes air traffic data, including traffic levels and weather, as it pertains to traffic capacity, traffic flows, points of congestion, peak hours, and other factors. Doc. # 60-18, FAA Order 7210.3, ¶ 17-4-3. The Traffic Management Unit works with airlines to plan alternative routes to prevent overloading the controllers. *Id*. ¶¶ 17-4-1, 17-4-4. The agency uses tools such as ground delays, ground stops, and severe weather avoidance plans to manage the flow of traffic so that the air traffic controllers' workload remains at the appropriate level. Doc. # 60-18.

FAA guidelines do not require the Traffic Management Unit to take any specific action after an MIS has been issued. Doc. # 60-18; Doc. # 70, fact 86. Accordingly, the use of an MIS is left to the FAA's discretion.

### I. No Known Severe Turbulence

Meteorologist Janus issued MIS 02 seven hours before LeGrande's turbulence event. Doc. # 60-13, Janus Decl. ¶¶ 18-19; Doc. # 60-12, MIS. Janus could not pinpoint an exact spot where severe turbulence might appear, if anywhere. He thus outlined a large block of airspace, 10,000 feet in height, covering parts of Michigan, Ohio, Pennsylvania, and New York, and identified the potential severe turbulence as "isolated." *Id.*

Janus never testified that the MIS constituted known severe turbulence, nor did he reach a dangerous forecast. Janus explained that the MIS expressed his judgment "that frequent moderate to isolated spots of severe turbulence *might possibly* develop over the next 12 hours, and that FAA management's flow-control decisions could be impacted *if such turbulence actually developed*." Doc. # 60-13, Janus Decl. ¶ 19, emphasis added. There was no evidence that Janus knew for a fact that severe turbulence was occurring or would occur at the spot where Flight 2745 encountered it. After issuing MIS 02, Janus monitored the situation for five more hours, then issued a CWA telling pilots to expect moderate to occasional severe turbulence in an area *east* of the Cleveland Airport. *Id.* ¶ 18. Janus did this because the weather conditions causing turbulence appeared to be moving in that direction. *Id.* No similar advisory was issued or in effect for the area west of the airport, where Flight 2745 flew. Doc. # 60-7, Miga Dep. at 50-52; Doc. # 60-9, Weather Package.

### J. Center Weather Service Unit Briefing

LeGrande alleges in her brief, for the first time in this case, that Janus negligently failed to provide the information in the MIS to FAA employees.

LeGrande Br. at 17, 19-22. LeGrande did not dispute, however, that "[t]he weather products at issue here were disseminated according to the normal course of business of the FAA and the NWS." Doc. # 70, fact 67; Doc. # 60-13, Janus Decl. ¶¶ 12-13, 15. It is undisputed that MISs are "made for air traffic managers." Doc. # 70, fact 72; Doc. # 60-13, Janus Decl. ¶ 5. Janus testified that he would have included a discussion of any applicable MIS during the regular briefings he gave to the Cleveland Center Traffic Management Unit and supervisors. Doc. # 71-5, Janus Dep. at 12-15; Doc. # 60-13, Janus Decl. ¶ 11. Janus's log states that he held briefings at 1942 UTC, after MIS 02 was issued, and at 0216 UTC, after MIS 03 was issued. Doc. # 71-18, Log.

## SUMMARY OF ARGUMENT

The district court's ruling should be affirmed because LeGrande could not meet her burden of proving (1) that the air traffic controllers breached the standard of care; and (2) that the FAA owed a duty to disseminate MIS 02 or 03 to the pilots of Flight 2745. LeGrande also could not establish causation.

LeGrande argues for the first time on appeal that the NWS meteorologist negligently withheld the contents of the MIS from the FAA. LeGrande Br. at 20-22. LeGrande failed to exhaust her administrative remedies on this claim with the Department of Commerce; moreover, arguments made for the first time on appeal are forfeited. Even if LeGrande were permitted to raise these new claims against the NWS, the United States would be entitled to judgment because she failed to present evidence that the NWS meteorologist breached the relevant standard of care or caused her alleged injuries.

Alternatively, the Court need not address LeGrande's allegations of FAA and NWS negligence because she challenges the way in which the FAA and the NWS designed the aviation weather system; as such, her allegations are barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

## ARGUMENT

### I. The District Court Properly Granted the United States' Motion for Summary Judgment.

#### A. Standard of Review.

A grant of summary judgment is reviewed *de novo*. *See Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005). Where, as here, the district court was faced with cross-motions for summary judgment, the appellate court construes all inferences in favor of the party against whom the motion under consideration is made. *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

#### B. The Air Traffic Controllers Breached No Duty to LeGrande.

The substantive negligence law of Ohio applies here. *Richards v. United States*, 369 U.S. 1, 9-10 (1962). LeGrande had the burden of presenting sufficient evidence to prove that an air traffic controller, supervisor, or manager failed to exercise the standard of care that a reasonably prudent person would have exercised under the circumstances. *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). An allegation of professional negligence requires LeGrande to show a breach of a professional standard of care with respect to the particular occupation, in this case, air traffic control. *See Second Nat'l Bank of Warren v. Demshar*, 707 N.E.2d 30 (Ohio Ct. App. 1997). The district court ruled that the controllers at Cleveland Center did not breach the standard of care in disseminating weather information to Flight 2745 because there was no evidence that they knew of, or should have known of, severe turbulence in Flight 2745's path.[5] Doc. # 78, Opinion at 16.

---

[5] In the motions before the district court, the United States argued that LeGrande failed to allege an actionable duty under Ohio negligence law. *E.g.*, Doc. # 68, USA Opp'n to Pl's Mot. Summ. J. at 9-15. The government made the argument because LeGrande apparently sought to impose on the controllers a duty to provide services that Center controllers do not provide and are not trained to provide, such as improvising a weather advisory. Doc. # 73, USA Reply at 13-14. The court found that air traffic controllers have a general duty to relay "certain weather information," but that duty did not extend to the MIS. Doc. # 78, Opinion at 15, 18-22.

With respect to the various weather products available on the night of the turbulence incident, the court found that none of the products provided a basis for the Cleveland air traffic controllers to be aware of severe turbulence in Flight 2745's path. Doc. # 78, Opinion at 17. The Center Weather Advisory was not pertinent because it applied to an area *east* of Cleveland Airport and LeGrande's flight was heading *west*. *Id*. The court found no pertinent PIREPs that the crew did not already have, as admitted by LeGrande and the Southwest Airlines flight dispatcher. Doc. # 78, Opinion at 17-18. It was undisputed that controllers do not receive, and do not broadcast, MISs. Doc. # 60-10, Behary Decl. ¶ 21; Doc. # 60-5, Burgess Dep. at 145-46.

In *Davis v. United States*, 824 F.2d 549, 550-51 (7th Cir. 1987), the Seventh Circuit ruled that the FAA did not breach a duty or cause an airplane accident as a result of a weather briefing, given that the controller "had no duty to pamper" an experienced pilot when the pilot knew how to obtain weather information. As in that case, the controllers here had no duty to provide special treatment for these experienced, professional airline pilots by making a continuous broadcast of historic weather information on the air traffic control frequency when all the weather information was available elsewhere for hours before departure. More important, the record contains no evidence that the controllers failed to provide all of the weather information that was available to them.

Moreover, Captain Moberg knew where to go if he wanted to obtain additional weather information. Doc. # 68-5, Moberg Dep. at 42. LeGrande does not dispute that all of the pilot reports, the Center Weather Advisory, and the Meteorological Impact Statements were disseminated automatically through the NWS national computer system, and were publicly available. Doc. # 70, facts 66-69; Doc. # 60-13, Janus Decl. ¶¶ 12-13, 15; Doc. # 60-14 at 8-9.

15

Because the air traffic controllers had no information about severe turbulence in Flight 2745's path that the air crew and/or dispatcher did not already possess, the district court properly ruled that the FAA did not breach the standard of care.

### C. The FAA Had No Duty To Broadcast the MIS on the Air Traffic Control Frequency.

The district court ruled that the FAA did not have a legal duty to disseminate any MIS or the information contained therein to the controllers or pilots.[6] Doc. # 78, Opinion at 18-21. The court found that FAA standards and procedures place no responsibility on controllers for disseminating MISs or the information in them to pilots. *Id.* at 18.

Controllers do not see MISs, nor is the information from an MIS printed on their General Information strip printers to be broadcast to pilots. *Id.* at 19. As noted by the court, LeGrande's air traffic control expert testified that air traffic controllers were not permitted to broadcast a HIWAS alert for an MIS.[7] *Id.* at 19. The court properly found that it was not FAA policy or practice to broadcast the information contained in an MIS to pilots. *Id.* at 21.

The district court examined the issue of whether a reasonably prudent air traffic controller would have foreseen that failing to disseminate an MIS was likely to cause harm. This standard is required to be met before a legal duty will attach.

---

[6] Meteorologist Janus testified that each subsequent MIS "replaces" the previous one, so MIS 03 replaced MIS 02. Doc. # 60-16, Janus Dep. at 76; *see also* Doc. # 60-14, NWS Instruction 10-803 at 11; Doc. # 60-13, Janus Decl. ¶ 17. For purposes of this appeal, however, the United States will assume that MIS 02 remained in effect at the time of the incident, as the issue is not material here.

[7] LeGrande mentions that issuing "safety alerts" is a priority for air traffic controllers, and implies that one should have been issued in this case. LeGrande Br. at 10. A safety alert is a term of art in the field of air traffic control, defined at Paragraph 2-1-6 of the Air Traffic Control Handbook (FAA Order 7110.65) and the FAA Pilot/Controller Glossary. It has a specific meaning, being issued only for unsafe proximity to terrain, obstructions, or other aircraft. A safety alert is not issued for weather conditions. Doc. # 73-3, Turner Dep. at 56-57; Doc. # 68-4, Turner Rep. at 5.

*Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1025 (Ohio 2002). The court concluded that LeGrande failed to satisfy this burden. Doc. # 78, Opinion at 19-20.

The court noted that forecasting weather involves an element of judgment, and that forecasting turbulence is extremely difficult. *Id.* at 20. Because meteorologist Janus did not believe the possibility of severe turbulence warranted issuing a weather product that would be disseminated to pilots, the district court found that a reasonable air traffic controller, with no meteorological training, would not have warned pilots of the possibility for isolated severe turbulence. *Id.* at 20.

LeGrande argues that Cleveland Center controllers were required to advise the pilots of the turbulence forecast contained in MIS 02, quoting, out of context, Section 2-6-2 of the Air Traffic Control Manual. LeGrande Br. at 10. But that section of the manual provides guidance on the Hazardous Inflight Weather Advisory Service ("HIWAS"), which is a continuous weather broadcast on a special frequency. When printed on their strip printers, controllers make a one-time HIWAS alert, informing pilots that new weather information is available on the HIWAS frequency. Doc. # 68-4, Turner Rep. at 6. The FAA does not broadcast HIWAS alerts for MISs, as LeGrande's air traffic control expert agreed: "Q: Are air traffic controllers permitted to broadcast a HIWAS alert for an MIS? A. Not that I know of." Doc. # 60-5, Burgess Dep. at 203. "Q: Does a controller have to read an MIS to pilots on his frequency? A: No. Q: Does he have to tell the pilots about the MIS in any form or fashion? A: No . . . ." *Id.* at 145-46. There was no evidence that a HIWAS alert should have been made but was not.[8]

---

[8] LeGrande also quotes the Facility Operation and Administration Order, FAA Order 7210.3, as mandating that "'severe or extreme turbulence (including clear air turbulence)' be disseminated to pilots by ATC." LeGrande Br. at 10. While the words "severe or extreme turbulence (including clear air turbulence)" can be found in § 6-3-1 of Order 7210.3T, that section deals with the classification and handling of PIREPs, not with MISs. The language quoted by LeGrande, in full context, instructs FAA managers to classify pilot reports of severe turbulence as "urgent PIREPs."

The district court discussed the decision of *Spurgin-Dienst v. United States*, 359 F.3d 451, 455 (7th Cir. 2004). In that case, the Seventh Circuit upheld the district court's finding that FAA personnel's failure to provide certain weather information was not the proximate cause of an airplane crash because, even if the pilot had the information, it was unlikely that the pilot would have changed his course because he already knew he was flying into icy conditions. *Id.* Despite ruling in the government's favor, the court there stated that the FAA weather briefer had committed "errors," including failure of the weather briefer to provide an Area Forecast and an MIS to the pilot. *Id.* The court of appeals did not include any additional discussion of the MIS issue, which was not mentioned in the lower court decision, nor did it address FAA and NWS policies regarding MIS dissemination. *Id.*

The district court here further distinguished the issues in *Spurgin-Dienst,* explaining in that case, the controller was an official weather briefer working at a Flight Service Station. Doc. # 78, Opinion at 21. Unlike the Cleveland Center air traffic controllers in the present case, the weather briefers at Flight Service Stations are trained in weather briefing and the primary purpose of their responsibilities is to provide weather information to pilots. *Id.* at 21. Further, air traffic controllers at Cleveland Center receive guidance from FAA Order 7110.65, "Air Traffic Control Manual," while weather briefers at a Flight Service Station receive guidance from FAA Order 7110.10, "Flight Services."

The district court properly distinguished the dicta in *Spurgin-Dienst* and ruled that the air traffic controllers here had no legal duty to disseminate any MIS information. Ohio law provides that duty depends on foreseeability: "This court has often stated that the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace*, 773 N.E.2d at 1025-26; *see also Mussivand v. David*, 544

N.E.2d 265, 270 (Ohio 1989); *Menifee v. Ohio Welding Prod., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984). It is undisputed that MISs are not meant for pilots, and that controllers do not broadcast MISs. Doc. # 60-10, Behary Decl. ¶ 21; Doc. # 60-5, Burgess Dep. at 145-46. It is undisputed that the MISs were produced and disseminated according to the normal course of business at the FAA and NWS. Doc. # 70, fact 67; Doc. # 60-13, Janus Decl. ¶¶ 12-13, 15. LeGrande has failed to establish that any act of the FAA or the NWS would have led a reasonably prudent person to foresee that an injury was likely to result. The undisputed evidence shows that agency employees complied with the policies and procedures of their respective agencies. Accordingly, the district court's ruling should be affirmed.

### D. LeGrande Could Not Meet Her Burden on Causation.

The district court did not reach the issue of causation, having ruled that LeGrande failed to meet her burden of proof on the breach and/or duty elements. Nevertheless, LeGrande's inability to prove causation provides an alternative basis to affirm the district court.

Under Ohio law, causation requires a factual nexus between the breach and injury (*i.e.*, actual cause) and a significant degree of connectedness that justifies imposing liability (*i.e.*, proximate cause). *Schirmer v. Mt. Auburn Obstetrics & Gyn. Assoc., Inc.*, 844 N.E.2d 1160, 1169 (Ohio 2006). A plaintiff must establish proximate cause by a preponderance of the evidence. Speculation "is not sufficient as a matter of law" with regard to proximate cause. *Whiting v. Ohio Dept. of Mental Health*, 750 N.E.2d 644, 647 (Ohio Ct. App. 2001).

The pilot is primarily responsible for the safe operation of the aircraft. *Somlo v. United States*, 274 F. Supp. 827, 843 (N.D. Ill. 1967), *aff'd*, 416 F.2d 640 (7th Cir. 1969) (finding pilot solely at fault for airplane accident caused by icing). The pilot in command of the airplane is directly responsible for, and is the final authority as to, the operation of the airplane. 14 C.F.R. § 91.3(a). As previously noted, an airline

pilot is responsible for providing the highest degree of care to the passengers and the crew. 14 C.F.R. § 121.533. Captain Moberg admitted that he was directly responsible for the safe operation of the flight. Doc. # 60-3, Moberg Dep. at 169. The FAA did not tell the pilots where to fly, and had no basis for denying them their chosen altitude. Doc. # 60-3, Moberg Dep. at 150. LeGrande's pilot expert admitted that controllers do not select an airplane's altitude: "Q: Does air traffic control select the altitude that you fly at? A: No." Doc. # 73-1, Dow Dep. at 195.[9]

LeGrande could not prove that the pilots would have flown in a different location even if the controllers had read them the information contained in MIS 02 during flight. Given Captain Moberg's testimony disparaging a private forecast for moderate turbulence because it was two hours old (Doc. # 60-3, Moberg Dep. at 132-33), there is no reason to believe that any forecast in an MIS would have changed his mind. Although Captain Moberg testified that he would not fly into "known or probable" severe turbulence conditions (Doc. # 60-3 at 166), and that he would have changed his altitude if an airplane directly in front of him reported severe turbulence (Doc. # 63-6 at 183), in this case there was no known or probable severe turbulence until he actually flew into it and reported it. Doc. # 60-7, Miga Dep. at 123; Doc. # 68-7, Schaffer Rep. at 4.

Captain Moberg stated in his affidavit that he was not familiar with the MIS weather product at all, so there is no factual basis to assume that information from an MIS would have caused him to change his chosen altitude. Doc. # 60-15, Moberg Aff. ¶¶ 4-5. *See Spurgin-Dienst,* 359 F.3d at 455-56 (finding no causation because

---

[9] In her brief, LeGrande quotes her air traffic control expert's report, in which he stated that the controllers should have "assigned" the flight to a lower altitude. LeGrande Br. at 9 n.4. It is up to the airline, however, to file its flight plan and determine its own route of flight and altitude. Doc. # 60-10, Behary Decl. ¶¶ 17-20; Doc. # 73-1, Dow Dep. at 195. "The FAA does not make determinations about whether airplanes will fly through areas of bad weather." Doc. # 60-10, Behary Decl. ¶ 17. The FAA also does not close blocks of airspace unless responding to extraordinary events such as 9/11. Doc. # 60-10, Behary Decl. ¶ 20.

plaintiffs could only speculate that certain weather information would have caused the pilot to fly a different route). Rather, the undisputed evidence showed that the pilots were trying to plan for a smooth flight by using "realtime" weather reports (Doc. # 63-1, Fitzgerald Dep. at 52), not flow-control planning forecasts. Accordingly, the undisputed evidence in the record showed neither factual nor proximate causation between the FAA's actions and LeGrande's injuries.

### E. LeGrande Has No Claim Against the NWS.

For the first time, LeGrande in this appeal alleges that she should recover damages against the United States for the alleged negligence of meteorologist Thomas Janus, an employee of the National Weather Service, U.S. Department of Commerce. LeGrande filed no administrative claim with the Department of Commerce, nor has either her complaint or amended complaint alleged National Weather Service negligence.

The Federal Tort Claims Act requires an administrative claim to be "presented in writing to the appropriate Federal agency." 28 U.S.C. § 2401(b); *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002). The statute precludes the filing of a lawsuit "unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675. This requirement is jurisdictional and cannot be waived. *McNeil v. United States*, 508 U.S. 106, 112-13 (1993); *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011-12 (7th Cir. 1991).

In determining whether allegations were properly exhausted by the plaintiff in an FTCA administrative claim, the Seventh Circuit looks to whether "the pertinent facts" underlying the claim were fairly presented to the appropriate federal agency in the administrative claim. *Palay v. United States*, 349 F.3d 418, 425-26 (7th Cir. 2003) (holding that allegations in administrative claim were insufficient to put agency on notice of additional allegations against same agency raised in district court). The pertinent facts supporting a claim will be deemed presented only if a

21

"legally sophisticated reader" of the administrative claim would have a reason to discern a connection between the plaintiff's injury and the specific conduct the plaintiff is asserting as a basis for his claim in district court. *Id.*

LeGrande had the opportunity to file a claim with the Department of Commerce for the alleged negligence of the NWS meteorologist, but failed to do so. LeGrande did file an administrative claim with the FAA (Doc. # 60-1, Admin. Claim), but that claim alleged negligence against the FAA only. In her claim, she listed six acts of negligence, and each act contained a citation to a purported violation of the Air Traffic Control Manual, FAA Order 7110.65. Doc. # 60-1 at 2. The claim was addressed to the FAA, and listed only the FAA in box 1, "Appropriate Federal Agency." The claim did not mention the National Weather Service, its manuals, or any meteorologist. Doc. # 60-1.

LeGrande made no allegations against the National Weather Service, so her claim could not have been transferred to the Department of Commerce as a claim filed with the FAA by mistake, 14 C.F.R. § 15.3. No legally sophisticated reader of the administrative claim would have had any reason to discern a connection between LeGrande's injury and these new allegations against the NWS. LeGrande's administrative claim was insufficient to put the government on notice of any claim against the Department of Commerce.

The plain language of the statute requires presentation to "the appropriate federal agency" before filing suit. 28 U.S.C. § 2401(b). "We are not free to rewrite the statutory text." *McNeil*, 508 U.S. at 111. The Supreme Court has noted the "clarity of the text" in § 2401(b) and that it is certainly not a "trap for the unwary," even in the case of a *pro se* plaintiff. *Id.* at 113. "The interest in orderly administration of this body of litigation is best served by adherence to the straightforward statutory command." *Id.* at 112. Because LeGrande failed to comply with the administrative claim requirements, her new allegations are barred by the

22

plain language of the Federal Tort Claims Act. Alternatively, the claims against the NWS should be deemed forfeited because they are raised for the first time on appeal. *See, e.g.*, *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002) ("A party waives any argument that it does not raise in the district court[.]").

### F. The Record Contains No Evidence the Meteorologist Breached a Duty or Caused LeGrande's Injuries.

Even if LeGrande had exhausted her administrative remedies against the NWS, LeGrande presented no evidence that the meteorologist breached any legal duty owed to her, or that such purported breach caused her injuries. There was no evidence that a reasonable meteorologist would have issued any different weather products than those issued by Janus on the night of the incident. LeGrande did not submit any rebuttal to Janus's declaration, and none of LeGrande's experts are meteorologists. Doc. # 60-5, Burgess Dep. at 82; Doc. # 73-1, Dow Dep. at 8, 191. Janus stated in his uncontested declaration that the weather conditions were rapidly changing on the night of the incident, and that he believed the weather system causing the turbulence was moving to the east. Doc. # 60-13, Janus Decl. ¶ 18. He thus issued a Center Weather Advisory for pilots flying to the east, only. *Id*. The NWS meteorologists at the Aviation Weather Center in Kansas City apparently agreed with Janus, given that they issued an AIRMET for moderate turbulence just thirteen minutes before the airliner encountered the turbulence. *Id*. ¶ 19. Thus, the most current NWS weather advisory for the area west of Cleveland called for moderate turbulence, not severe turbulence. There had been no previous pilot reports of severe turbulence in that area, and the air traffic controller was "very, very surprised," according to the First Officer, when the pilots reported the severe turbulence. Doc. # 60-4, Fitzgerald Dep. at 78, 135. That Flight 2745 experienced severe turbulence does not establish negligence, but rather highlights the difficulty in forecasting turbulence.

There was no evidence that Janus failed to disseminate MIS 02 or MIS 03 according to the standard procedure for disseminating MISs. Doc. # 60-13, Janus Decl. ¶¶ 11-12; Doc. # 60-12, Janus Dep. at 28-29, 87-88. Indeed, contrary to LeGrande's new argument that the meteorologist "declined to provide that information [in the MIS] to the Cleveland Center," (LeGrande Br. at 17), LeGrande did not dispute the fact that the "weather products at issue here were produced and disseminated according to the normal course of business at the FAA and the NWS." Doc. # 70, fact 67. National Weather Service Instruction 10-803 sets forth the way in which MISs are automatically processed, via telecommunications gateway and computer processing, "to ensure appropriate MIS and CWA dissemination." Doc. # 60-14 at 8. Janus's daily log further indicates that he followed the standard briefing practices of the Center Weather Service Unit. Doc. # 71-17. LeGrande has no factual support whatsoever for these new allegations of negligence against the National Weather Service.[10]

LeGrande relies on the case of *United States Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297 (11th Cir. 2009) ("*USAU*"), to support her argument that the NWS was required to provide the MIS to pilots and controllers. This case does not support LeGrande's position. In *USAU*, an airplane crashed in Georgia, and the insurers sued the United States under the Federal Tort Claims Act for damage to the airplane. The insurers argued that the NWS Aviation Weather Center in Kansas City should have issued a SIGMET warning for severe clear air turbulence, relying on National Weather Service Instruction 10-811. 562 F.3d at 1298-99. The district court granted the United States' motion for summary judgment based on the discretionary function exception, 28 U.S.C. § 2680(a), and

---

[10]  For the same reasons set forth above with respect to causation, LeGrande has also failed to prove facts showing that any alleged negligence by the NWS caused her injuries, especially given that Captain Moberg was not familiar with the MIS weather product, and did not know of any authorization by Southwest Airlines for him to use an MIS for operational purposes. Doc. # 60-15, Moberg Decl. ¶¶ 4, 6.

the court of appeals affirmed. The court ruled that the act of forecasting turbulence is a discretionary act, requiring subjective determinations by professional meteorologists who analyze competing social, economic, and political factors. *Id*. at 1300.

NWS Instruction 10-811 is not at issue in this case because the SIGMET provisions do not apply to a Center Weather Service Unit meteorologist such as Janus. Doc. # 60-13, Janus Decl. ¶¶ 8-9. As Janus stated in his declaration, he does not issue SIGMETs: "The NWS has a facility called the Aviation Weather Center ("AWC") in Kansas City, Missouri, staffed with a team of meteorologists. The Aviation Weather Center creates a number of aviation weather products that are meant for use by pilots, including Airman's Meteorological Information (AIRMET), Significant Meteorological Information (SIGMET), [and others] . . . ." Doc. # 60-13, Janus Decl. ¶ 8. Janus explained that "Center Weather Service Units, such as the one where I work in Cleveland, do not issue these products. They come only from the Aviation Weather Center in Kansas City." *Id*. ¶ 8.

Rather than NWS Instruction 10-811, which was at issue in *USAU*, Janus used NWS Instruction 10-803, which applies to a Center Weather Service Unit. Doc. # 60-14, NWSI 10-803. "I will create an MIS only if, in my judgment, certain weather conditions will adversely impact the flow of air traffic within the Cleveland Center's area of responsibility. (NWS Instr. 10-803 at 10.)" Doc. # 60-13, Janus Decl. ¶ 6.

Based on his experience and training, Janus declared that the Aviation Weather Center issues SIGMETs "for certain specific weather conditions such as severe turbulence or severe icing if, in the judgment of the forecaster, it will affect an area of 3,000 square miles." Doc. # 60-13, Janus Decl. ¶ 9. Janus stated that he did not recall "ever seeing a SIGMET for 'isolated severe turbulence' unless the isolated turbulence was associated with thunderstorm activity. . . . 'Isolated' turbulence

generally means small areas of turbulence, which would not meet the SIGMET requirements of the weather condition affecting an area of 3,000 square miles." *Id.* ¶ 9. Generally speaking, a SIGMET is an aviation weather advisory of a current time frame, as opposed to an MIS, which is a long-term general forecast for flow-control use. The issuance and dissemination of SIGMETS is different than for MISs. *Id.* ¶¶ 9, 19-22.

Furthermore, to the extent LeGrande seeks to rely on *USAU* for the proposition that the NWS should have issued a SIGMET, she offered no evidence that the weather conditions on the night of the incident met the standards for a SIGMET prior to the turbulence incident. The Aviation Weather Center issued an AIRMET for moderate turbulence just thirteen minutes before the incident (*id.* ¶ 19), apparently because the Aviation Weather Center meteorologists determined that weather conditions did not merit a SIGMET for severe turbulence before the Southwest airliner encountered the turbulence.

LeGrande quotes the *USAU* decision out of context for the proposition that the NWS is required to alert pilots to any sort of forecast that mentions the words "severe turbulence," even if the forecast is not meant for pilot/controller distribution. The line she relies on is: "The United States concedes that, once the National Weather Service forecasts moderate to severe turbulence, the United States government has no discretion to decline to provide that information to pilots." 562 F.3d at 1299. The *USAU* opinion does not involve the duties of meteorologists at a Center Weather Service Unit and the issuance and dissemination of an MIS under NWS Instruction 10-803. The issuance and dissemination of SIGMETS is different from the issuance and dissemination of MISs. The dissemination criteria for SIGMETs discussed in the *USAU* case does not apply to MISs. There is no evidence that the MISs here were not disseminated according to the standard set forth in NWS Instruction 10-803. *See* Doc. # 60-13,

26

Janus Decl. ¶¶ 12-13, 15; Doc. # 60-19, NWS Product Description for the MIS, Jan. 30, 2003, at 2. In short, SIGMETs are for pilots; MISs are not. The line from *USAU* cannot be read to hold that the NWS must alert pilots to a forecast issued in an MIS, which is, by design, for internal flow-control purposes only and not meant for pilots.

## II. The Discretionary Function Exception Bars LeGrande's Claims Because They Challenge the FAA's and the NWS's Design of the Aviation Weather System.

### A. Standard of Review.

Decisions on whether allegations fall within the discretionary function exception to the FTCA are reviewed *de novo. Calderon v. United States,* 123 F.3d 947, 948 (7th Cir. 1997).

### B. The Discretionary Function Exception

Contrary to her statements, LeGrande's lawsuit inherently challenges discretionary policy decisions and actions of two government agencies, the FAA and the NWS, including her new allegations against the National Weather Service meteorologist. The district court did not reach the summary judgment issue involving application of the discretionary function exception, except to observe in a footnote it was "likely that the FAA's and NWS's determination of how to utilize different weather products, including which ones to require controllers to disseminate to airline pilots and which ones are for internal planning purposes only, falls within the FTCA's discretionary-function exception." Doc. # 78, Opinion at 11 n.5. Nevertheless, this provides an alternative ground to affirm the district court's judgment.

Under the Federal Tort Claims Act, the United States is not liable for negligence allegations that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be

abused." 28 U.S.C. § 2680(a). The discretionary function exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)); *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). The Supreme Court recognized that tort actions challenging the government's discretionary policy judgments could "seriously handicap efficient government operations." *Id.* at 814.

The Supreme Court has established a two-part inquiry to guide the application of the discretionary function exception. *See Berkovitz*, 486 U.S. at 536-37; *Calderon*, 123 F.3d at 949. First, the court must determine if the agency violated a mandatory policy, statute, or regulation specifically prescribing a course of action. Second, the court must determine if the conduct is of the type the exception was designed to protect, *i.e.*, whether the government's action is "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

## C. The Challenged Actions Were Discretionary.

LeGrande does not contest the FAA's and the NWS's discretion to design the aviation weather system with different products for different users. LeGrande Br. at 17 n.5; Doc. # 71 at 31; Doc. # 71 facts 72, 76, 86. The government designed the system so that all NWS weather products are readily available from multiple sources, and air traffic controllers can expect that pilots and dispatchers have complied with their regulatory mandates of researching the weather before they take off. Doc. # 60-10, Behary Decl. ¶ 3; *see also* 14 C.F.R. part 121. The safety of the aviation system depends in large part on voluntary compliance with the Federal Aviation Regulations, including 49 C.F.R. parts 91 and 121, which apply to air carriers. Professional pilots and dispatchers are well aware of how to obtain weather information. Doc. # 68-5, Moberg Dep. at 42. The en route air traffic control

frequency is not the place to go for a detailed briefing of weather information that is available on the ground or through a separate dedicated radio frequency created for that specific purpose (the HIWAS frequency). Doc. # 60-10, Behary Decl. ¶ 3, 15. The decisions made in setting up the aviation weather system in this way are "quintessentially" discretionary functions of the type intended to be protected from suit. *See Collins v. United States*, 564 F.3d 833, 839 (7th Cir. 2009) (affirming judgment for the United States on discretionary function grounds because the FAA had the discretion to balance factors such as cost, mission priorities, and reducing airline delays in making decisions about which equipment to install at air traffic control towers).

There is no evidence that either the FAA or the NWS violated any mandatory statute, regulation, or policy in designing a weather dissemination system that takes place primarily off the air traffic control frequency. With respect to information in the MISs, FAA flow-control managers have the discretion to review specific weather forecasts that were created only for flow-control purposes, and not send them to controllers to read on the air traffic control frequency. LeGrande's air traffic control expert agreed that controllers do not broadcast MISs or otherwise tell pilots about MISs in any form or fashion. Doc. # 60-5, Burgess Dep. at 145-46. LeGrande cites no directive that required the controllers in communication with Flight 2745 to read any information contained in an MIS once, let alone repeatedly, for hours, on the air traffic control frequency.

Turning to LeGrande's new allegations against the meteorologist, the meteorologist exercised choice and judgment in making forecasting decisions. LeGrande points to no statute, regulation, or policy that specifically required Janus to issue a weather product forecasting severe turbulence that should have been broadcast over the air traffic control frequency. In *USAU*, the Eleventh Circuit held that forecasting turbulence requires a meteorologist to exercise judgment and

29

choice in analyzing a range of data, and that issuing weather warnings implicates social, economic, and political factors such as expense of warnings and dangers to air safety of overwarning. 562 F.3d at 1300.

LeGrande claims that regardless of the label of the weather product, its information must still be disseminated if it contains the words "severe turbulence." First, it again should be noted that the MIS at issue here forecasted "frequent moderate" to "isolated severe" turbulence for air traffic flow-control use only. Second, and key to the discretionary function analysis, the classification of a weather product is basic to the effective functioning of the aviation weather system. The NWS guidelines set standards for weather products, and those standards maintain national consistency in the weather system. The "label" of a weather product is critical to the system. The classification both defines the product's scope and establishes the way in which it will be distributed and used. To contend, as LeGrande urges, that the information in a weather product should be disseminated everywhere even though that product is intended for a specific audience is contrary to the judgment and choices made by the FAA and the NWS and has the potential for creating great confusion among aviation weather users.

### D. The Challenged Actions Were Policy-Based.

The challenged acts or omissions comply with the second part of the discretionary function test because they are susceptible to policy analysis. Providing specific weather products for specific users permits meteorologists to tailor their weather products to their intended audience. As discussed above, the FAA and the NWS decided that flow-control traffic managers could benefit from a long-range forecast tailored specifically to their needs, whereas pilots would benefit from a separate product with a time span more relevant to *their* needs. LeGrande's views on how the system should be set up would chill meteorologists' ability to tailor weather products for particular users, and cause air traffic controllers to use limited

time on the air traffic control frequency reading outdated weather forecasts that are not meant for pilots. *See* Doc. # 60-13, Janus Decl. ¶ 22; Doc. # 60-10, Behary Decl. ¶ 15; *Collins*, 564 F.3d at 839 (citing allocation of limited funds and "reducing the delays caused by crowded skies" as part of the policy analysis in applying the discretionary function exception); *USAU*, 562 F.3d at 1300 ("issuing weather warnings implicates policy concerns" and quoting *Brown v. United States*, 790 F.2d 199, 204 (1st Cir. 1986): "A weather forecast is a classic example of a prediction of indeterminate reliability, and a place peculiarly open to debatable decisions, including the desirable degree of investment of government funds and other resources.").

With respect to LeGrande's new claims against the NWS meteorologist, Janus stated: "The reason for having multiple aviation weather products is to tailor the product to the user. Because I know an MIS is for air traffic planning purposes only, I can make a forecast that is broad and long-range, and more inclusive of weather events that may (or may not) develop over the next 12 hours." Doc. # 60-13, Janus Decl. ¶ 22. Janus also emphasized that he must be cognizant of the possibility of overwarning: "If pilots receive too many warnings of severe turbulence that never materialize because the forecast was so far in the future, pilots could become desensitized to the advisories, and the advisories and forecasts could be ignored and thus no longer serve their purpose." *Id.* ¶ 22. Janus explained that aviation weather forecasting is difficult and complex, "involving the consideration and analysis of multiple data sources in a dynamic environment," and that he uses his best professional judgment to make his forecasts and tailor them for the appropriate audience. *Id.* ¶ 21.

In summary, because the evidence established that LeGrande's claims are premised upon and challenge established FAA and NWS policy pertaining to the

design and implementation of the aviation weather system, the discretionary function exception bars her lawsuit.

## CONCLUSION

For the foregoing reasons, the court should affirm the district court's grant of summary judgment to the United States.


DATED this 7th day of September, 2011.


Respectfully submitted,

TONY WEST
Assistant Attorney General

PATRICK J. FITZGERALD
United States Attorney

TIMOTHY GARREN
Acting Deputy Assistant Attorney General


 s/ Jill Dahlmann Rosa
JILL DAHLMANN ROSA
ALAN MATTIONI
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, DC 20044-4271
Telephone: (847) 732-1141


OF COUNSEL:

BRADLEY PREAMBLE
Office of the Chief Counsel
Federal Aviation Administration
800 Independence Ave., S.W.
Washington, DC 20591

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,112 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) along with Circuit Rule 32 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using WordPerfect Version X4 in 12-point font size, Century Schoolbook type style.

Dated: September 7, 2011

  s/ Jill Dahlmann Rosa
JILL DAHLMANN ROSA
ALAN MATTIONI
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, D.C. 20044
Telephone: (847) 732-1141
Facsimile: (202) 616-4002

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2011, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 s/  Jill Dahlmann Rosa
JILL DAHLMANN ROSA
ALAN MATTIONI
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, DC 20044
Telephone: (847) 732-1141
Facsimile: (202) 616-4002